## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE: HARDIEPLANK FIBER CEMENT
SIDING LITIGATION

Case No. 12-md-2359
MDL No. 2359

THIS DOCUMENT RELATES TO
ALL ACTIONS

**MEMORANDUM OF LAW &
ORDER**

Robert K. Shelquist, Karen Hanson Riebel, and Scott Moriarity, Lockridge Grindal Nauen, PLLP, Plaintiffs' Lead Counsel, and Charles J. LaDuca, Cuneo Gilbert & LaDuca, LLP; Charles E. Schaffer, Levin, Fishbein, Sedran & Berman; Clayton D. Halunen, Melissa Wolchansky, Amy E. Boyle, and Christopher J. Moreland, Halunen Law; Michael McShane, Audet & Partners, LLP; Nicholas J. Drakulich, The Drakulich Firm; D. Michael Campbell, Campbell Law; Lawrence Deutsch, Shannon J. Carson, Robin Switzenbaum, and Jake Polakoff, Berger & Montague PC; and Frances Baillon and Shawn J. Wanta, Baillon Thome Jozwiak & Wanta LLP, Plaintiffs' Executive Committee.

Christopher M. Murphy, Peter B. Allport, and Daniel Campbell, McDermott Will & Emery LLP; and Aron J. Frakes and Rachna B. Sullivan, Fredrikson & Byron, PA; Counsel for Defendant James Hardie Building Products Inc.

## I.    INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Class Certification

[Docket No. 229] and Defendant's Motion to Exclude Plaintiffs' Experts'

Testimony [Docket No. 244].  The Court heard oral argument on December 15

and 16, 2016.

1

The Court grants Defendant's Motion to Exclude Plaintiffs' Experts'
Testimony because the expert's methodology is fundamentally flawed and
untrustworthy and his opinions are unhelpful and unreliable. The Court denies
Plaintiffs' Motion for Class Certification. Any common issues of law and fact
will be overwhelmed by a myriad of individualized fact questions and a variety
of applicable state laws with material differences. In particular, causation issues
will require individualized mini-trials for each class member.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Overview of the Hardieplank Product

Defendant James Hardie Building Products Inc. ("Hardie") originated in
Australia in 1888, but now sells fiber-cement products around the world.
([Docket No. 260] Moriarity Decl., Ex. B, Exponent Report at 6.) Fiber-cement is a
composite material made of sand, cement, and cellulose fibers. (Id.) Hardie first
began selling its exterior fiber-cement siding, Hardieplank, in the United States
in 1987. (Id.) Since that time, Hardie has made at least seven major changes to
Hardieplank, including changing formula additives, design changes (such as
altering the shape of the planks to improve water shedding), and manufacturing
method improvements. (Id. at 18-20.) Some Hardieplank versions are sold with

Hardie's factory-coated paints, while other versions are sold as primed-only products, which can be painted either in a factory or in the field.  (Id. at 14-16.)

### 2.    The Hardieplank Warranty

Until 2009, Hardie provided a 50-year prorated limited warranty with Hardieplank.  Since 2009, it has provided a 30-year non-prorated limited warranty.  (Exponent Report at 6.)  Both warranties are referred to as Hardie's Limited Warranty.  The Limited Warranty warrants that Hardieplank complies with ASTM C1186, the American Society for Testing and Materials standard, when manufactured and "is free from defects in material and workmanship" / "is free from defects in material and manufacture."  ([Docket No. 273] Allport Decl., Ex. 3, 30-Year Limited Warranty § 1; Allport Decl., Ex. 4, 50-Year Limited Warranty § 1.)  With regard to freeze-thaw resistance in exterior fiber-cement products, ASTM C1186 provides:

> The specimens, when tested in accordance with Test Method C1185 [], for 50 [freeze-thaw] cycles, shall not show visible cracks or structural alteration such as to affect their performance in use.  The ratio of retained strength as calculated from the [flexural strength] test results shall be at least 80%.

([Docket No. 273] Allport Decl., Ex. 6, ASTM C1186 § S.7.)

3

The 50-Year Limited Warranty also states that, when "properly installed and maintained according to Hardie's published installation instructions, the Product for a period of 50 years from the date of purchase . . . will not crack, rot or delaminate." (50-Year Limited Warranty § 1.)

The Limited Warranty extends to the first retail purchaser of the siding, the first owner of the structure to which the siding is applied, and the first transferee of the structure. (30 Year Limited Warranty § 1; 50-Year Limited Warranty § 1.) The Limited Warranty excludes coverage for performance of any third-party paints, stains, or coatings applied to Hardieplank. (30-Year Limited Warranty § 4; 50-Year Limited Warranty § 3.) The Limited Warranty also excludes from coverage damage or defects resulting from "any cause other than manufacturing defects attributable to Hardie." (Id.)

As for a remedy, the 50-Year Limited Warranty provides:

> If during the Warranty period, any Product proves to be defective, Hardie, in its sole discretion, shall replace the defective Product before it is installed, or, during the first year, reimburse the covered person for resulting losses up to twice the retail cost of the defective portion of the Product. During the 2nd through the 50th year, the warranty payment shall be reduced by 2% each year such that after the 50th year no warranty shall be applicable. If the original retail cost cannot be established by the covered person, the cost shall be determined by Hardie in its sole and reasonable discretion. Hardie's replacement of the defective Product or granting of a refund

pursuant to Section 1 of this Warranty SHALL BE THE SOLE EXCLUSIVE REMEDY available to the covered person with respect to any defect. Hardie will not refund or pay any costs in connection with labor or accessory materials.

(50-Year Limited Warranty § 1.)

The 30-Year Limited Warranty provides that, during the 30-year period, if

the siding is

defective in material or workmanship, Hardie will, in its sole discretion, either repair or replace the defective portion of the Product, or, during the first (1st) through the thirtieth (30th) year, reimburse the Covered Person for up to twice the original retail cost of the defective portion of the Product. . . . Hardie's repair, replacement, or refund of the defective portion of the Product or reimbursement pursuant to Section 2 of this Limited Warranty is the exclusive remedy for the Covered Person for any defect in materials or workmanship. **HARDIE WILL NOT REFUND OR PAY ANY COSTS IN CONNECTION WITH LABOR OR ACCESSORY MATERIALS.**

(30-Year Limited Warranty § 2.)

### 3.    Alleged Defects in Hardieplank Siding

Hardieplank is manufactured using the Hatschek process, in which a roller

applies multiple fiber-cement layers or "laminas." (Exponent Report at 7-8.)

When the laminas in the substrate separate, the board "delaminates."

According to Plaintiffs, Hardieplank has a common defect of low

interlaminar bond ("ILB") strength, which makes it easier for moisture to invade

the substrate and push the laminas apart, causing delamination and coating adhesion problems. (Exponent Report at 2-3.) Thus, Hardieplank fails prematurely before its expected life. (Id.)

According to Plaintiffs' expert's testing, newly manufactured Hardieplank has an average ILB of 0.82 Megapascals ("MPa"). (Exponent Report at 68.) Plaintiffs assert that CertainTeed, a Hardie competitor, manufactures its fiber-cement siding with an average ILB of 1.97 MPa. ([Docket No. 273] Allport Decl., Ex. 7, Wolf Dep. 331. See also Moriarity Decl., Sealed Ex. 5 at 8.) Plaintiffs' experts did not conduct their own tests of any non-Hardieplank fiber-cement siding; the CertainTeed estimate is based on an internal Hardie test of two CertainTeed boards.

Plaintiffs' expert, Joel Wolf, conducted 50- and 150-cycle freeze-thaw tests on 5 samples of new Hardieplank and 6 samples of used Hardieplank taken from Plaintiffs' structures. (Exponent Report at 66-70.) Of the 5 new samples, 3 showed some decrease in ILB after 50 freeze-thaw cycles and 3 showed some decrease in ILB as compared to original ILB after 150 freeze-thaw cycles. (Id. 69.) Of the 2 used samples tested for 50 cycles, one increased in ILB and one

decreased.  (Id.)  Of the 3 used samples tested for 150 cycles, all three decreased

in ILB.  (Id.)  The sixth sample appeared to end up with an ILB of 0.  (Id.)

> Wolf opines that Hardie
>
> fiber-cement products have a common defect – low inter-laminar
> bond strength.  This common defect and high water absorption
> results in the propensity for delamination and coating adhesion
> problems due to extended exposure to climactic variables, including
> freeze-thaw cycling, snow, and precipitation.  This common defect
> also results in the propensity for delamination when the siding is
> subject to mechanical stresses from installation and handling,
> including nailing and saw cutting of the siding.

(Exponent Report at 2.)

Freeze-thaw cycling occurs when water enters the pores in the material,

freezes, and expands; then the expansion creates new pores; the ice melts and

water fills the new pores; and the process repeats until the material breaks down.

([Docket No. 273] Allport Decl., Ex. 31, RDH Building Science Laboratories

("BSL") Report at 7-10.)  However, this process does not occur unless the

material reaches the "critical degree of saturation," such that there is enough

water to freeze and expand and distort the porous material.  (Id. at 9.)  If the

material is not at the critical degree of saturation, freeze-thaw cycling can occur

indefinitely without causing damage.  (Id. at 9-10.)

According to Hardie's expert, Hardieplank only reaches the critical degree of saturation if it is continuously submerged in water. (BSL Report at 36-37.) Plaintiffs' expert admits that Hardieplank delamination is typically limited to boards closest to the ground or on a second floor wall close to the intersecting roof where the siding is likely to come into contact with accumulated snow or a "path of flowing water." (Exponent Report at 62, 82.) Hardie asserts that the only boards on Plaintiffs' houses that show delamination were in these locations and were installed in violation of Hardie's installation instructions with insufficient clearance, so that they were exposed to standing water. ([Docket No. 273] Allport Decl., Ex. 16, Tsongas Report at 119.) Thus, Hardie asserts that installation error caused all delamination.

Plaintiffs' experts admit that a certain amount of gapping, up to 1/16th of an inch, is normal ([Docket No. 273] Allport Decl., Ex. 7, Wolf Dep. 269-70), that a larger gap is not a problem if the builder installed flashing behind the gap (id. 270), that gapping could also be the result of installation error (Allport Decl., Ex. 34, Davis Dep. 128), and that the only way to know if a gap was caused by excessive shrinkage of Hardieplank is to measure the boards on both sides of the gap (id. 159-60).

8

One of Hardie's experts reported that when he removed the allegedly "warped" siding from Plaintiffs' walls, he found that the sheathing underneath was warped, causing the flexible Hardieplank board to appear warped. ([Docket No. 273] Allport Decl., Ex. 16, Tsongas Report at 2-3, 43-44, 94-95.) Plaintiffs' expert agreed that, when the allegedly warped siding was removed from the wall and placed on the ground, it no longer appeared warped and lay flat. ([Docket No. 273] Allport Decl., Ex. 34, Davis Dep. 126.)

Hardie's expert found 29 cracks out of 10,000 Hardieplank boards inspected on Plaintiffs' houses. ([Docket No. 273] Allport Decl., Ex. 16, Tsongas Report at 2.) The cracks typically occurred at a bottom corner of a plank around a nail head where the nails were improperly installed too close to the edges of the board. (Id.) Failing to comply with Hardie installation instructions to install nails ¾ to 1 inch away from the edge of the siding causes cracks to form, as seen on Plaintiffs' houses. (Id. at 26; [Docket No. 273] Allport Decl., Ex. 32, 2004 Hardie Installation Instructions; Allport Decl., Ex. 45, Exponent Report Appendix Excerpts, at A13-40.)

As for discoloration and fading, Plaintiffs' expert concluded that the degradation of the coatings on the six Plaintiffs who complained of it was normal

for the age of Plaintiffs' homes.  (Exponent Report at 100.)  Plaintiffs' coatings

expert also concluded "that there is nothing defective about the coatings."

([Docket No. 273] Allport Decl., Ex. 37, Guyer Dep. 146.)

### 4.    Warranty Claims

From 2001 through 2015, Hardie sold billions of square feet of Hardieplank

in the United States and received warranty claims on a very small percentage of

the siding sold.  ([Docket No. 273] Allport Decl., Ex. 8, Sealed Priest Report at 20.)

Plaintiffs' experts opined that, based on warranty claims, delamination

was the primary cause of Hardieplank failure and that such failures occurred

more often in cold, wet conditions.  (Exponent Report at 48, 57; Moriarity Decl.,

Ex. 13, Steffey Dep. 71.)  The warranty claim data shows that most warranty

claims were made within 6 years of installation, with almost all claims occurring

within 15 years.  (Exponent Report at 54.)

### 5.    Hardie's Advertising

In 2000, Hardie was reaching 32 million consumers through its advertising.

(Moriarity Decl., Ex. 23, 2000 HardiAdvantage Alliance Training Manual at 649.)

In 2000 and 2002, Hardie advertised in several major home-living magazines, in

newspapers, on the radio, and on television; it also conducted one-on-one

presentations with marketing and management teams for dealers and builders throughout the United States.  (Id.; Moriarity Decl., Ex. 24, 2002 Sweet's Catalog Hardie Advertisement at 95.)  Hardie's marketing strategy used intermediaries to transmit its representations about Hardieplank to consumers through cooperative marketing.  (See Moriarity Decl., Ex. 27, 2004 Hardie Factory Build Housing Handbook at 790-91.)

A 1997 Hardie advertisement stated that Hardieplank is "low maintenance," "resists moisture damage," "won't crack, rot or delaminate," and "offer[s] a lifetime of low maintenance backed by a 50-year product warranty" (Moriarity Decl., Ex. 28, 1997 Hardiplank Hardipanel Brochure at 514-15.)  In 2000-2004, it advertised that Hardieplank was "backed with a 50-year limited transferable warranty" and asserted that Hardieplank is "low maintenance," "resists moisture damage," "won't crack, rot or delaminate," or other similar statements.  (See, e.g., Moriarity Decl., Ex. 29, 2000 Hardie Siding Brochure; Moriarity Decl., Ex. 30, 2001 Hardie Advertisement; Moriarity Decl., Ex. 31, 2001 Hardie Brochure; Moriarity Decl., Ex. 32, 2002 Hardie Brochure; Moriarity Decl., Ex. 34, 2003 Sweets Catalog Hardie Advertisement; Moriarity Decl., Ex. 35, 2004 Sweets Catalog Hardie Advertisement.)  A 2008 brochure stated: "James Hardie

siding is tough.  Remarkably so.  And to prove it, most of our products come

with a 50-year transferable warranty.  Rain.  Hail.  Impact.  Wind.  Fire.

Fluctuations in humidity.  Even hurricanes.  None of its stands a chance against

James Hardie."  (Moriarity Decl., Ex. 39, 2008 Hardie "A Siding for All Seasons"

at 549.)

    Wolf opined that, if a customer sees a 50-year warranty, the customer

expects the siding to last 50 years.  (Moriarity Ex. 6, Wolf Dep. 203.)  Plaintiffs

also point to a 1993 article from the Journal of Consumer Research, in which the

authors note the theory that manufacturers might use the warranty as a "signal"

of the durability of their goods, and attempt to test whether consumers do view

the length of a warranty as a signal of durability.  (Moriarity Decl., Ex. 43,

William Boulding and Amna Kirmani, A Consumer-Side Experimental

Examination of Signaling Theory: Do Consumers Perceive Warranties as Signals

of Quality?, 20 J. Consumer Research 111 (1993).)  The study's authors opined

that their laboratory experiment showed that, if a firm has high credibility,

consumers are more likely to see a long warranty as a signal of quality, but that

this is not true for a low credibility firm.  (Id. at 119.)  They further explained that

their research was limited to one laboratory experiment with one fictional

company that made personal computers, so generalizations could not be made.

(Id. 119-22.)

###    6.    Overview of Named Plaintiffs

There are eleven Plaintiffs named in the First Amended Consolidated

Complaint and two more sets of Plaintiffs who filed separate complaints.  They

live in 10 different states.  Each Plaintiff's specific facts are set forth in detail in

the order addressing the individual summary judgment motion directed at that

Plaintiff's claims.  Some Plaintiffs chose and purchased Hardieplank, while other

purchased used homes that already had Hardieplank installed.  Some of those

who purchased used homes knew that Hardieplank was installed on the home,

while others did not.  Some who purchased used homes were informed of

problems with the siding before purchasing the house.  Some Plaintiffs viewed

Hardie marketing or advertising materials before purchasing the siding or house.

Others received information about Hardieplank only from third parties.  Still

others recall no particular information about Hardieplank that they received

before making their purchase.

Plaintiffs allege various different problems with their Hardieplank: delamination, gapping, warping, cracking, peeling/loss of coating, and fading or discoloration.

## B.     Procedural History

In March 2011, Plaintiff Heidi Picht sued Hardie in Minnesota state court and the matter was removed to this Court.  Hardie moved for summary judgment and to dismiss.  (Civil File No. 11-958 [Docket No. 25])  The motion was stayed until the remainder of the MDL cases were also at the summary judgment stage.

After their individual cases were consolidated in this Court as a Multidistrict Litigation, eleven Plaintiffs from eight states filed a Consolidated Complaint.  [MDL Docket No. 33]  On July 15, 2013, this Court denied in part and granted in part Defendant's motion to dismiss the Consolidated Complaint. [MDL Docket No. 60]  On August 9, 2013, Plaintiffs filed the First Amended Consolidated Complaint, which names the following as named Plaintiffs: Heidi Picht (Minnesota), Jonathan Bowers (Minnesota), Hugh Fenwick (Nevada), Michael Swiencki (Georgia), the Susan S. Buchanan Personal Residence Trust through its trustee Susan Buchanan (Florida), James Dillingham (California),

John Brown (Illinois), Mark Kostos (Illinois), Richard Treece (Illinois), Masoud Kavianpour (Virginia), and Brian Bethel (Ohio).  [MDL Docket No. 63]

On June 30, 2014, the Court granted in part and denied in part Defendant's motion to dismiss the Complaint in a tag-along action filed by Wisconsin Plaintiff Steven Schindler.  [MDL Docket No. 116]  Schindler has since left the litigation and has been replaced with Wisconsin Plaintiffs David and Sharon Angelici (Civil File No. 14-285 [Docket Nos. 33-1, 36].)

On April 27, 2015, the Court granted in part and denied in part Defendant's motion to dismiss the Complaint in a tag-along action (Civil File No. 14-4655) filed by Colorado Plaintiff John Hernandez.  [MDL Docket No. 135]

Based on the First Amended Consolidated Complaint [MDL Docket No. 63], the Angelicis' Complaint, and Hernandez's Complaint, remaining before the Court are 1) breach of express warranties by all Plaintiffs except Illinois Plaintiffs Treece and Kostos, 2) breach of implied warranties by Minnesota Plaintiff Picht and Colorado Plaintiff Hernandez; 3) a negligence claim by Picht; 4) declaratory and injunctive relief claims for all Plaintiffs; 5) statutory consumer protection claims by all Plaintiffs; 5) an unjust enrichment claim by Wisconsin Plaintiffs the Angelicis; and 6) a failure of essential purpose claim by Hernandez.

III.    **DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' TESTIMONY [DOCKET NO. 244]**

A.    **Opinion of Plaintiff Expert Joel Wolf**

Plaintiffs' expert Joel Wolf is an engineer for Exponent Failure Analysis Associates ("Exponent"). ([Docket No. 260] Moriarity Decl., Ex. A, Wolf CV.) Wolf is a licensed professional civil engineer with a bachelor's and master's degree in civil engineering from the University of Wisconsin. (Id.)

Wolf issued an expert report on July 7, 2015. ([Docket No. 260] Moriarity Decl., Ex. B, Exponent Report.) He reviewed Hardie's formulas for Hardieplank from 1998 through 2014. (Id. at 9-10, 18-20.) He opined that many of Hardie's improvements to the Hardieplank formula were caused by Hardie's concern about the siding's freeze-thaw performance and to improve ILB. (Id. at 23.)

Based on Wolf's review of Hardie documents produced in this lawsuit, he opined that Hardieplank had concerns with delamination or separation of the lamina, moisture intrusion in the substrate, coating issues, shrinkage or expansion of the substrate, and ILB strength. (Exponent Report at 24-31.) The most common warranty claim received by Hardie involved delamination. (Id. at 47-48.)

16

Based on academic studies, Wolf opined that there are general concerns about the ability of fiber-cement siding to tolerate moisture intrusion, especially in freeze-thaw climates, and that Hardie's Hatschek process made the fiber-cement siding particular susceptible to moisture intrusion and freeze-thaw issues. (Exponent Report at 117-18.)

Wolf and other Exponent employees visited Plaintiffs' homes and visually inspected the Hardieplank on their structures. (Exponent Report at 59-60.) Wolf visually inspected more than 1,000 specimens of Hardieplank that Hardie had received from warranty claimants. (Id. at 108-13.)

Wolf performed a laboratory freeze-thaw analysis with 6 new planks supplied by Hardie and 6 planks taken from Plaintiffs' structures, testing for ILB, flexural strength, and moisture absorption. (Exponent Report at 66-75.) Wolf also employed a consultant to perform a compositional analysis. (Id.)

When testing for ILB, Wolf tested 5 unused planks and 6 used planks. (Exponent Report at 69.) Wolf found that the average ILB for unused Hardieplank was 0.82 MPa, and the average ILB for used Hardieplank from Plaintiffs' houses was 0.56 MPa. (Id. at 68.) Wolf's laboratory testing of 5 unused Hardieplank planks showed that exposure to 50 freeze-thaw cycles, the ASTM

17

industry standard, resulted in a 2.8% increase in average ILB strength (id. at 68); the ILB strength of 40% of the 5 unused samples increased after exposure to 150 freeze-thaw cycles (id. at 69); the ILB strength of the 2 samples from Plaintiffs' houses exposed to 50 freeze-thaw cycles increased in 1 sample and decreased in the other (id.); and the ILB strength of the used samples that were exposed to 150 freeze-thaw cycles all decreased (id.).

Based on these tests, Wolf opined that freeze-thaw exposure reduced Hardieplank's ILB, making it more vulnerable to moisture intrusion and delamination.  (Id. at 70.)

Based on Wolf's statistical analysis of Hardieplank warranty claim data, he concluded that there was a statistically significant association between Hardieplank failures and exposure to moisture through rain, snowfall, and freeze-thaw cycles.  (Exponent Report at 56-57.)

Based on Exponent's analysis, Wolf opined that coatings were not a contributor to Hardieplank failures.  (Exponent Report at 104-05.)

Overall, Wolf opined that all Hardieplank had a fundamental intrinsic defect: low ILB, which made the siding vulnerable to moisture intrusion and premature deterioration, which caused delamination and reduced coating

adhesion.  (Exponent Report at 2.)  Wolf also opined that Hardieplank should,

but would not, last 50 years.  (Id. 3, 114-16.)  Finally, he provided a formula that

purports to calculate damages on a classwide basis by assuming that all houses

are 3,000 square feet, two-story houses, requiring 100% replacement of the siding

for delamination or paint adhesion problems and 50% replacement for gapping

or warping.  (Id. at 120.)

Wolf testified that Hardieplank does satisfy the ASTM C1186 freeze-thaw

standard.  ([Docket No. 247] Allport Decl., Ex. E, Wolf Dep. 317-19.)

### B.    **Daubert Standard**

The admissibility of expert testimony is governed by Federal Rule of

Evidence 702.  The proponent of the testimony has the burden to show by a

preponderance of the evidence that the testimony is admissible under Rule 702.

Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  Under the Rule:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Under the framework developed in <u>Daubert</u>, trial courts must serve as gatekeepers to insure that proffered expert testimony is both relevant and reliable.  Trial courts are given broad discretion in fulfilling this gatekeeping role . . . ."  <u>Wagner v. Hesston Corp.</u>, 450 F.3d 756, 758 (8th Cir. 2006) (citations omitted).  The proposed testimony must be useful to the factfinder; the expert witness must be qualified; and the proposed evidence must be reliable.  <u>Lauzon</u>, 270 F.3d at 686.  "[D]oubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility."  <u>Miles v. Gen. Motors Corp.</u>, 262 F.3d 720, 724 (8th Cir. 2001) (citation omitted).

In determining the reliability and relevance of the proffered testimony, the Court examines factors such as

whether the theory or technique is subject to testing, whether it has been tested, whether it has been subjected to peer review and publication, whether there is a high known or potential rate of error associated with it, and whether it is generally accepted within the relevant community.

Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted).

> Subsequent cases have proposed additional factors, including, whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

Polski v. Quigley Corp., 538 F.3d 836, 839 (8th Cir. 2008) (citation omitted).

However, "[t]his evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject Daubert factors as the particular case demands. There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." Unrein, 394 F.3d at 1011 (citation omitted).

> If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate. Even a theory that might meet certain Daubert factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case.

Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000)

(citations and footnote omitted). However,

> [a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally

> unsupported that it can offer no assistance to the jury must such
> testimony be excluded.

Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001) (citation omitted).

> [N]othing in either Daubert or the Federal Rules of Evidence
> requires a district court to admit opinion evidence that is connected
> to existing data only by the ipse dixit of the expert. A court may
> conclude that there is simply too great an analytical gap between the
> data and the opinion proffered.

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

### C.   Daubert and Class Certification

The Eighth Circuit has held that, at the class certification stage, the district

court need not conduct "a full and conclusive Daubert inquiry." In re Zurn Pex

Plumbing Prod. Liab. Litig., 644 F.3d 604, 612, 614 (8th Cir. 2011). This is because

"a court's inquiry on a motion for class certification is tentative, preliminary, and

limited;" the court "must determine only if questions of law or fact common to

class members predominate over any questions affecting only individual

members [and if] a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy;" and a class certification decision is

usually made before discovery is closed. Id. at 613. Thus, the Court need only

conduct "a focused Daubert analysis which scrutinize[s] the reliability of the

expert testimony in light of the criteria for class certification and the current state

of the evidence." Id. at 614.

### D.    Opinions at Issue

Hardie moves the Court to exclude the following opinions by Wolf and/or

Exponent:

> 1. Products produced or manufactured by Hardie, including but not
> limited to Hardieplank lap siding, have low ILB strength;

> 2. Products produced or manufactured by Hardie, besides the
> specific samples of fiber-cement siding tested by Plaintiffs' retained
> expert, Joel Wolf, have low ILB strength;

> 3. The ILB strength of Hardie's products, including but not limited
> to Hardieplank lap siding, create a propensity for delamination;

> 4. The length of Hardie's limited warranty is a representation of the
> useful life of the products produced or manufactured by Hardie;

> 5. Fiber-cement siding products produced or manufactured by
> Hardie, including but not limited to Hardieplank lap siding, are
> expected to last for more than 50 years (or any other amount of time)
> and do not; and

> 6. Damages may be calculated on a classwide basis.

### E.    Wolf's Opinion that All Hardie Fiber-Cement Products Have Low ILB Strength and that Low ILB Strength Creates a Propensity for Delamination

The Court grants Hardie's request to strike Wolf's opinion that

Hardieplank has a common defect, low ILB, which causes a propensity for

delamination and coating adhesion issues due to extended exposure to freeze-thaw cycling, snow, and precipitation.  (Exponent Report at 2.)  Wolf's testing methodology is unreliable and his opinion that Hardieplank has low ILB is unhelpful and unreliable.  His study is so fundamentally flawed that allowing a witness designated as an expert to testify about this study and his opinion formed based on the results would serve only to confuse the jury.  No reasonable jury could conclude that, based on Wolf's study, there is a classwide design defect in Hardieplank.

The Court need not conduct a full-fledged <u>Daubert</u> analysis at this stage.  Rather, the Court need only focus on whether the expert opinion is reliable insofar as showing a common question and suitability for class certification.  Wolf's small sample size and contradictory test results cannot serve to show that there is a classwide flaw caused by low ILB.

### 1.    Reliability of Wolf's Testing Methods

Wolf used unreliable testing methods to determine Hardieplank's ILB strength.  Wolf's testing methodology has never been used before, has no peer review, and has no evidence of acceptance within the field.  ([Docket No. 247] Allport Decl., Ex. E, Wolf Dep. 339-40, 342.)  He has no good explanation for

choosing 150 freeze-thaw cycles when ASTM standards only specify 50 cycles.

(See Wolf Dep. 368-69.)  This distinction is important because, after 50 cycles, the

average ILB of unused Hardieplank samples increased.  (Exponent Report at 68.)

Moreover, Wolf cored his samples before testing their ILB strength (Exponent

Report at 68), when the only article on ILB testing of fiber-cement siding, and the

article upon which Wolf relied, warned that doing so would "inevitably" cause

delamination. (Exponent Report 67-69, 117 n.192; Allport Decl., Ex. E, Wolf Dep.

341-44; ([Docket No. 247] Allport Decl., Ex. H, Katherine G. Kuder and Surendra

P. Shah, Effects of Pressure on Resistance to Freezing and Thawing of Fiber-

Reinforced Cement Board, 100 ACI Materials Journal 463, 464-65 (Nov.-Dec.

2003) ("Kuder and Shah (2003)").)

### 2. Reliability of Statistical Sampling

Wolf provides no basis to extrapolate his results to claim that all or most

Hardieplank has low ILB.  He only tested 5 new samples for ILB strength,

although 70 new samples were provided to him by Hardie and he could have

obtained more from any store.  ([Docket No. 247] Allport Decl., Ex. F.)  And he

admits that he did no statistical analysis of his work.  (Wolf Dep. 68, 409.)  There

is no known error rate.  (Id.)  Wolf failed to document how the samples were

selected; nor did he have a sampling plan.  (Cf. [Docket No. 249] Allport Decl.,

Ex. K, Wilner Report at 3, 5-8.)  See Harper v. Trans World Airlines, Inc., 525 F.2d

409, 412 (8th Cir. 1975) ("[S]tatistical evidence derived from an extremely small

universe, as in the present case, has little predictive value and must be

disregarded."); Coleman v. Oracle USA, Inc., No. CIV. 09-3472 (DSD/JJG), 2011

WL 2746187, at *6 (D. Minn. July 14, 2011) (excluding expert opinion when

proponent did "not show that [the expert's] sample size of eight [] is large

enough to be statistically significant.").

It is clear that the results of Wolf's tests do not support his theory: after 50

cycles the average ILB strength of unused Hardieplank increased.  After 150

cycles, 2 of the 5 unused samples had higher ILB than before they underwent any

cycles.  After 150 freeze-thaw cycles, Wolf found no evidence of delamination,

cracking, warping, or anything else on the unused samples before they were

cored.  (Wolf Dep. 407.)

As for the used samples, Wolf used a modification of tests (ASTM and

Kuder and Shah) that were only for unused samples.  He only tested 6 used

samples, all from Plaintiffs claiming defects.  He did not test any used samples

from non-Plaintiffs.  Thus, he cherry picked 6 "flawed" planks out of the billions

currently on U.S. structures, but seeks to opine that they are representative of the

ILB strength of all Hardieplank. Wolf has no opinion whether his samples were

statistically significant or their error rate. Cases such as <u>Marvin Lumber</u>, <u>Zurn</u>

<u>Pex</u>, and the drug causation cases cited by Plaintiffs are inapposite because they

addressed experts who were statisticians and who opined that their methods

were accepted in the field. Additionally, the plaintiffs in most of those cases

could not obtain more statistically significant data. None of that is true here. <u>Cf.</u>

<u>Marvin Lumber & Cedar Co. v. PPG Indus., Inc.</u>, 401 F.3d 901, 916 (8th Cir. 2005)

(holding that objections to statistician's study on the grounds that "data was

collected by an employee of Marvin's legal department who was aware of the

purpose of the studies; that the sample size was too small and the samples were

not taken from a representative geographical cross-section" go "primarily to the

factual basis for Martin's analysis, not to its evidentiary reliability," which "goes

to the credibility of the testimony, not the admissibility") (citation omitted); <u>In re</u>

<u>Zurn Pex Plumbing Prod. Liab. Litig.</u>, 267 F.R.D. 549, 556 (D. Minn. 2010)

(admitting statistician's opinion regarding the useful life of a plumbing system

even though the statistician lacked sufficient data to generate statistically

significant conclusions, because statistician did have enough information to

supply reliable estimate at class certification stage based on "[the defendant's]

own flow testing parameters, the testimony of other experts, and general

information about the average lifetime of a plumbing system" and statistician

testified that, "where . . . the data is insufficient to calculate the value, estimating

a value is a generally accepted methodology in the field"), aff'd, 644 F.3d 604 (8th

Cir. 2011); In re Neurontin Mktg., Sales Practices, & Prod. Liab. Litig., 612 F.

Supp. 2d 116, 140 (D. Mass. 2009) (holding that, when there was no way to

achieve drug-specific statistical significance, expert evidence on causation is still

permitted, when, for example, "there is statistically significant information about

the class of drugs and other indicia of reliability").

### 3.    Support in the Record for Wolf's Opinion

Wolf's opinion that Hardieplank's ILB is too low is unreliable and

unhelpful because he cannot define what number ILB would be acceptable.  He

merely states that the ILB should be as high as CertainTeed's ILB.  (Allport Decl.,

Ex. E, Wolf Dep. 333.)  However, Wolf has never tested CertainTeed and relies on

one internal Hardieplank document that tested only two CertainTeed planks.

Another internal Hardieplank testing document showed Hardieplank planks

with initial ILBs higher than CertainTeed's ILB.  (Compare Allport Decl., Ex. E,

Wolf Dep. 333 (testifying that an appropriate ILB strength is one that would "match or exceed . . . the ILB strength of the CertainTeed"); [Docket No. 250] Allport Decl., Sealed Ex. O at 236338; with Allport Decl., Sealed Ex. P.)  Apart from his comparison to CertainTeed, Wolf points to no evidence that shows Hardieplank has low ILB strength.  He can point to no peer-reviewed article.  Wolf could not even testify to what the average ILB strength of Hardieplank was. (See Allport Decl., Ex. E, Wolf Dep. 327-29.)

Wolf performed no testing on CertainTeed to determine its initial ILB, has no evidence of how CertainTeed's ILB was affected by 150 freeze-thaw cycles, and has no evidence about whether CertainTeed would delaminate after freeze-thaw cycling (or under the conditions present at Plaintiffs' houses).  Thus, he has no basis for opining that CertainTeed performs better than Hardieplank, or even that it has a higher ILB.

### 4.    Opinion that Low ILB Causes Delamination

Wolf's testing methodology is unreliable and his opinion that Hardieplank has low ILB, which creates a propensity for delamination, is unhelpful and unreliable.

Wolf's own tests do not support his theory that low ILB plus freeze-thaw cycles cause delamination or any other problems in Hardieplank. Even after 150 freeze-thaw cycles, Wolf saw no evidence of delamination or any other problem with the unused samples that he tested before coring. (Allport Decl., Ex. E, Wolf Dep. 407.) And he had no opinion as to how many freeze-thaw cycles would need to occur before a Hardie product would delaminate. (Id. 415-16.)

Also, Wolf admits that siding should not be in standing water, yet he did not account for whether Hardieplank would ever get as saturated as it did during his freeze-thaw testing in the field when correctly installed and he did not opine on how saturated it would need to be for freeze-thaw damage to occur. (Wolf Dep. 142-43, 148, 202.) Nor did he account for whether installation errors, which are obvious to the naked eye in Exponent's photographs of Plaintiffs' structures[1], contributed to the problems with Plaintiffs' Hardieplank. (Id. 121.) Wolf's explanation that installation errors could not have caused the deterioration of siding on Plaintiffs' houses because Hardieplank only rejected a

---

[1] For example, siding was installed flush with the roof below, without flashing, so that the gutters poured water directly onto unpainted cut edges of the siding or siding was installed to the tops of steps or onto hardscape, without clearance. (See, e.g., [Docket No. 249] Allport Decl., Ex. L, Exponent Report, Appendix A at A4-12, A10-15, A11-12.)

small percentage of warranty claims as installation errors is nonsensical because the universe of siding that Wolf inspected was only from Plaintiffs who either had had their warranty claims rejected by Hardie (as installation or third-party coating errors) or who had not submitted warranty claims.

The Court concludes that Wolf had no basis to conclude that low ILB was a uniform defect across Hardieplank boards that caused delamination or any of the other defects allegedly viewed by Plaintiffs.

### F.    Wolf's Opinion that a Manufacturer Warranty Is a Representation of the Useful Life of the Product

The Court excludes Wolf's opinion that the length of a warranty is a representation of a product's useful life.  Wolf opines: "Based on marketing materials and industry literature, the James Hardie siding is expected to last 50+ years."  (Exponent Report at 3.)  In Wolf's deposition, he stated that "when a homeowner sees a 50-year warranty – they expect it to last 50 years."  (Allport Decl., Ex. E, Wolf Dep. 203, 216, 218.)

Wolf has no academic, professional, or practical experience or qualifications to opine on the average consumer's understanding of a warranty. His personal opinion of the meaning of the length of a warranty is not helpful because it is no more valuable than the opinion of any lay person who has had

experience with a warrantied good, such as a car or household appliance. Also,

Wolf cites no basis or support for his opinion.

### G. Wolf's Opinion that the Siding Should but Cannot Last More than 50 Years

Wolf opines that "the James Hardie siding materials are falling well short

of life expectancy for exterior siding materials. Based on marketing materials

and industry literature, the James Hardie siding is expected to last 50+ years."

(Exponent Report at 3.)

Based on Wolf's general work experience with building materials and his

education as an engineer, he is qualified to opine on the life expectancy of

building materials, such as siding. However, his opinion is unreliable and

unhelpful because he changed it three times within one deposition. He testified

that siding should last 50 years. (Wolf Dep. 206, 209.) Then he admitted that

ASTM standards are that siding should last 20 to 40 years. (Id. 206, 209.) Then

he testified that most consumers expect siding to last 30 years. (Id. 204.) Wolf

also testified that siding should not be expected to last 50 years if not installed

correctly or if constantly moistened. (Id. 219-20, 230.) He provides no basis for

the 50 years opinion other than Hardieplank's former 50-Year Limited Warranty.

(Id. 218.)

### H.     Wolf's Opinion on Damages Calculation

Wolf seeks to testify that 100% of the siding should be replaced on any homes with any reported delamination and/or paint adhesion issues and that 50% of the siding should be replaced on homes with "excessive" gapping and warping.  (Exponent Report at 120.)  Wolf opines that the costs for these replacements can be estimated by assuming that each house is 3,000 square feet, requires 7 ¼ inch lap siding, has 3,600 square of Hardie's siding, will require demolition and installation of 100% or 50% of the 3,600 square feet of siding and house wrap, and will need to be primed and repainted.  (Id.)

The Court excludes Wolf's damages formula as baseless, unreliable, and unhelpful.  Under his proposed formula, if one plank on the house shows delamination or paint issues, all of the siding must be replaced.  However, he also testified that if none of the siding showed delamination or paint issues, none of the siding should be replaced.  (Wolf Dep. 20-21.)  He provides no explanation for this all-or-nothing distinction.  Nor does his formula address the possibility that delamination or other damage could have been caused by installation errors, instead making Hardie responsible for 100% of the replacement costs, even if the damage was caused by gross installation errors.  (Wolf Dep. 55.)  This is inconsistent with the approach Wolf has taken in other lawsuits.  (See id. 119.)

33

Wolf admitted that there would need to be some way of "sorting those things out," but he provides no opinion on how to do so.  (Id. 55.)

Also, Wolf provides no basis for assuming that 3,600 square feet of siding would need to be replaced on every house with delamination or adhesion problems.  Only one Plaintiff requested replacement of that much siding. (Exponent Report, Appendix A at A7-2.)  Other Plaintiffs asserted that affected siding and trim was only 5 square feet to 1,220 square feet.  (Id. at A1-2, A2-2, A4-2, A5-2, A12-2.)  During his deposition, Wolf admitted that claims procedures and individualized home inspections would be required to accurately calculate damages.  (Wolf Dep. 18-19, 21-24, 169-71.)  Thus, he admits that his proposed formula is not useful in this case.

## IV.  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [DOCKET NO. 229]

The Court denies Plaintiffs' motion for class certification.  Any common issues of law and fact will be overwhelmed by a myriad of individualized fact questions and a variety of applicable state laws with material differences.  In particular, causation issues will require individualized mini-trials for each class member.

### A.    Class Certification Standard

34

The class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion.  <u>Gen. Tel. Co. of the Sw. v. Falcon</u>, 457 U.S. 147, 155 (1979).  Whether an action should be certified as a class action is governed by Rule 23 of the Federal Rules of Civil Procedure.

> To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b).  The Rule 23(a) requirements for class certification are: (1) the putative class is so numerous that it makes joinder of all members impractical; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

<u>In re St. Jude Med., Inc.</u>, 425 F.3d 1116, 1119 (8th Cir. 2005) (citing Fed. R. Civ. P. 23(a)) (footnote and other citations omitted).

Plaintiffs seek certification of two classes: one under Rule 23(b)(2) and one under Rule 23(b)(3).

Rule 23(b)(2) permits a class action when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  This is known as an injunction class.

Rule 23(b)(3) allows a class action when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

### B.   Proposed Classes

In their motion, Plaintiffs request that the Court certify the following two classes:

**Rule 23(b)(3) Class**: All individuals and entities that own structures physically located in the states of California, Georgia, Illinois, Minnesota, Ohio, Virginia, and Nevada on which Hardieplank-brand siding is currently installed and where the owner has suffered any measurable injury from failure or deterioration of Hardieplank.

**Rule 23(b)(2) Class**: All individuals and entities that own structures physically located in the United States on which Hardieplank-brand siding is currently installed and where the owner has suffered any measurable injury from failure or deterioration of Hardieplank.

In their briefs, Plaintiffs further explain that the Rule 23(b)(3) class could further be broken down to assert breach of express warranty under California, Georgia, Illinois, Minnesota, Nevada, Ohio, and Virginia law; to assert a violation of the consumer protection statutes of Minnesota, California, Virginia, and Colorado; and into a Nevada subclass for breach of implied warranty. ([Docket No. 231] Pls. Opening Brief at 16, 27, 32, 33-34.)  In a footnote, Plaintiffs also ask the Court to certify two Rule 23(b)(3) breach of express warranty sub-classes under Wisconsin and Florida law.  (Id. at 27 n.7.)

## C.    Proposed Class Definition

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d 992, 996 (8th Cir. 2016) (citation omitted).  In the Eighth Circuit, the question of whether a proposed class is

clearly ascertainable is answered as part of the rigorous analysis performed

under Rule 23; it is not addressed "as a separate, preliminary requirement."  Id.

Therefore, the Court will not address the question of ascertainability separately,

as Hardie requests.

### D.    Numerosity (Rule 23(a)(1))

Numerosity is met when the proposed class is "so numerous that joinder

of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs claim that

hundreds of thousands of homeowners have purchased Hardieplank throughout

the United States.  Hardie does not dispute numerosity.  The Court concludes

that numerosity has been met.

### E.    Whether Plaintiffs Claims Are Typical (Rule 23(a)(3))

Typicality requires that "the claims or defenses of the representative

parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

"The burden is fairly easily met so long as other class members have claims

similar to the named plaintiff.  Factual variations in the individual claims will not

normally preclude class certification if the claim arises from the same event or

course of conduct as the class claims, and gives rise to the same legal or remedial

theory."  Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996)

(citations omitted).

Here, the named Plaintiffs do assert the same claims as the rest of the proposed class.  However, they are subject to unique defenses.  The named Plaintiffs claims are not typical of other class members' claims because they were exposed to different representations and, often, were not exposed to the alleged misrepresentations from Hardie at all.  Also, the statute of limitations is a significant issue in many of their claims.

### F.   Whether Plaintiffs Are Adequate Class Representatives (Rule 23(a)(4))

The Court agrees that the named Plaintiffs are adequate representatives because they "have common interests with the members of the class, and . . . will vigorously prosecute the interests of the class through qualified counsel." Paxton v. Union Nat. Bank, 688 F.2d 552, 562–63 (8th Cir. 1982).

### G.   Common Questions (Rule 23(a)(2))

Federal Rule of Civil Procedure 23(a)(2) requires that there are "questions of law or fact common to the class."

> Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. . . . Their claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

<u>Wal-Mart Stores, Inc.</u>, 564 U.S. at 349–50 (citation omitted).

Rule 23(a)(2)'s commonality requirement requires more than the existence of common questions: "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." <u>Wal-Mart Stores, Inc.</u>, 564 U.S. at 350 (citation omitted).

Here, as explained in further depth with respect to the predominance factor, there is no common proof of low ILB strength. Plaintiffs cannot even state what number of ILB strength would be appropriate. Nor is there common proof that Hardieplank's ILB strength decreases after freeze-thaw cycling. The only evidence Plaintiffs point to is Wolf's report, and the Court has excluded Wolf's opinions that all Hardie fiber-cement products have low ILB strength.

Furthermore, Plaintiffs have no common proof that low ILB causes Hardieplank to delaminate. They have no evidence that ILB strength correlates to delamination or deterioration in the field. The Court has excluded Wolf's opinion that low ILB strength creates a propensity for delamination. Nor have Plaintiffs pointed to evidence that warping and gapping are related to ILB. (<u>Cf.</u>

Exponent Report at 3, 64-65 (opining on the causes of warping and gapping but never mentioning ILB strength).)

Even if Plaintiffs could prove that Hardieplank had low ILB strength that increased its propensity to disintegrate, that finding would not be apt to drive the resolution of the litigation because individual causation, among other things, would still need to be proven for each individual class member.

### H.    Whether Common Issues Predominate (Rule 23(b)(3))

#### 1.    The Predominance Requirement

"At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence."  <u>Avritt v. Reliastar Life Ins. Co.</u>, 615 F.3d 1023, 1029 (8th Cir. 2010).

> If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question.  If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.

<u>Id.</u> (citations omitted).

> Rule 23(b)(3), however, does <u>not</u> require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof.  What the rule does require is that common questions <u>predominate</u> over any questions affecting only individual [class] members.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 469 (2013) (citations

omitted).

## 2.    Failure to Meet the Predominance Requirement

The Court finds that common issues do not predominate because Hardie's

liability to all proposed class members cannot be established with common

evidence.  At a minimum, Hardie will have the right to challenge, as to each

individual class member, whether he or she was exposed to an actionable

warranty or misrepresentation before buying Hardieplank; had an injury to

Hardieplank beyond normal wear and tear given the location, conditions and

age of the house; and had an injury to Hardieplank caused by low ILB as

opposed to installation errors, a third-party coating, or some other cause.  Hardie

will also have a right to require an individual damages evaluation for each class

member, which, according to Plaintiffs' own expert, will require an individual

home inspection.  The Court will also have to inquire regarding the statute of

limitations, which entails when the siding was bought, when the problem arose,

when the class member discovered or should have discovered the problem, and

whether equitable tolling applies.

### 3.   Information to Which Each Class Member Was Exposed

The proposed class was exposed to materially different representations, which form the basis for the breach of the informal express warranty and consumer statute claims.  See, e.g., In re St. Jude Med., Inc., 522 F.3d 836, 838-40 (8th Cir. 2008) (finding that common issues did not predominate in misrepresentation case when defendant presented evidence that class members received different representations and some did not receive any material representation, so "plaintiff-by-plaintiff determinations" on causation and reliance would need to be made to determine liability under consumer fraud statutes).  Among the named Plaintiffs, some testified that they heard and saw nothing about Hardie before purchasing Hardieplank; others testified that they heard and saw nothing from Hardie before purchasing Hardieplank, but heard or saw statements by third parties; and still others testified that they did see or hear various Hardie representations.

In order for a marketing or advertising representation to be part of the basis of the bargain for every relevant state's breach of warranty law, the putative class member must have at least been exposed to the representation.  See, e.g., In re: Elk Cross Timbers Decking Mktg., Civil Action No. 15-18 (JLL), MDL No. 2577, 2015 WL 6467730, at *28 (D.N.J. Oct. 26, 2015).  Similarly, every

state's consumer protection law requires that the consumer received the alleged misrepresentation.  See, e.g., In re St. Jude Medical, 522 F.3d at 838-40.  Determining whether a class member was exposed to a particular representation will require individualized fact finding.

The most common representation upon which Plaintiffs rely is that someone told them that Hardieplank came with a 50-year warranty.  However, case law does not support Plaintiffs' signal theory that a representation that a product has a warranty of a particular length means that the product will last that long.[2]  As this Court has previously held, "[a]n advertisement's reference to

---

[2] Plaintiffs cite to two cases as supporting signal theory, one of which is simply citing the other.  However, in each case, the court was holding that the plaintiffs failed to state a claim under California consumer statutes and, in dicta, stated that a consumer could only expect a product to last for the length of the warranty period, which the products in those cases did.  See Daugherty v. Am. Honda Motor Co., 51 Cal. Rptr. 3d 118, 129 (Cal. Ct. App. 2006) (holding that plaintiffs failed to state a claim under the California unfair competition law when they alleged an engine defect that manifested after the term of the 3-year express warranty and stating that "[t]he only expectation buyers could have had about the F22 engine was that it would function properly for the length of Honda's express warranty, and it did"); In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig., 758 F. Supp. 2d 1077, 1089 (S.D. Cal. 2010) ("Where a manufacturer has expressly warranted a product, consumers can only expect that product to function properly for the length of the manufacturer's express warranty.  Plaintiffs have not alleged that the televisions failed to live up to Sony's representations during the term of the Express Warranty.") (citing Daugherty, 51 Cal. Rptr. 3d at 129).

a formal limited warranty does not, on its own, create a new informal promise

that the product will last for a certain amount of time without any of the terms or

conditions of the limited warranty." Hardieplank Fiber Cement Siding Litig.,

No. 12-MD-2359, 2014 WL 2987657, at *3 (D. Minn. June 30, 2014). See also

Gonzalez v. Corning, 317 F.R.D. 443, 516 (W.D. Pa. 2016) (noting that plaintiffs

could provide "no citation to any legal authority to support their foundational

contention that a limited warranty of a set number of years is a representation

about the useful life of a product" and concluding that "Plaintiffs' theory is not

only novel and unsupported, but also is contrary to law"). As a practical matter,

accepting signal theory would eviscerate warranties by requiring that if a

manufacturer provided any type of limited warranty, it would become a

guarantor for its product for that length of time, regardless of the terms and

limitations of the written warranty.

Moreover, the law review article cited by Plaintiffs actually rejects signal

theory. See George L. Priest, A Theory of the Consumer Product Warranty, 90

Yale L.J. 1297, 1327, 1347 (1981). In a deposition in a different MDL, In re Atlas

Roofing Corporation Chalet Shingle Products Liability Litigation, MDL Docket

No. 2495 (N.D. Ga), Professor Priest testified that "the point of the paper" was

that the evidence supported his investment theory rather than the signal theory or the exploitation theory.  ([Docket No. 281] Supp. Wolchansky Decl., Ex. 17, Priest Dep. 99.)  He testified that he "disagree[d] with that [signal theory], and [he had] found it not to be true."  (Id. 116.)  He further testified that he recalled only one article "trying to show empirical support for the signal theory, but it was unpersuasive" and he did not "know if it was peer-reviewed or not."  (Id. 100.)

Other common representations relied upon by Plaintiffs are that Hardieplank is durable or requires little or no maintenance.  At a minimum, the laws of some relevant states will deem these statements to be non-actionable puffery.  See, e.g., Gold v. Lumber Liquidators, Inc., No. 14-CV-05373-TEH, 2015 WL 7888906, at *7 (N.D. Cal. Nov. 30, 2015) (holding that a statement that a building product is "exceptionally durable" is non-actionable puffery under California law); Saltzman v. Pella Corp., No. 06 C 4481, 2007 WL 844883, at *4 (N.D. Ill. Mar. 20, 2007) ("Plaintiffs point to the fact that Pella referred to its products as 'durable,' 'manufactured to high quality standards,' 'maintenance free,' and that the company said that it would 'stand by its products.'  The subjective and non-quantifiable nature of these claims render them puffery.").

Thus, for those putative class members who were, in fact, exposed to representations from Hardie before buying Hardieplank, the Court will need to make individual determinations to find out if they were exposed to actionable misrepresentations, or only to non-actionable statements under each applicable state's law.

The only claim for which the mix of information to which the putative class members were exposed will not be a prohibitive issue is the breach of formal express warranty claim, because it appears that all Plaintiffs' siding was subject to Hardie's 50-Year Limited Warranty, and all putative class members' siding would be subject to the terms of either Hardie's 50-Year Limited Warranty or its 30-Year Limited Warranty.

### 4.    Reliance

#### a)    Reliance for Consumer Protection Statutes

The consumer protection statutes at issue either require proof of reliance, see Bronson v. Johnson & Johnson, Inc., No. C 12-04184 CRB, 2013 WL 1629191, at *2 (N.D. Cal. Apr. 16, 2013) (California Unfair Competition Law and California Legal Remedies Act); Adardour v. Am. Settlements Inc., No. 1:08CV798 AJT/TRJ, 2009 WL 1971458, at *3 (E.D. Va. July 2, 2009) ("Virginia courts have consistently

held that reliance is required to establish a VCPA [Virginia Consumer Protection Act] claim."), aff'd, 382 F. App'x 249 (4th Cir. 2010); allow a defendant to avoid liability by proving that an individual plaintiff did not rely on the defendant's representations, see In re St. Jude Med., Inc., 522 F.3d 836, 840 (8th Cir. 2008) (holding that, even if Minnesota consumer fraud statutes do "not require the plaintiffs to present direct proof of individual reliance," they "surely do[] not prohibit [the defendant] from presenting direct evidence that an individual plaintiff [] did not rely on representations from [the defendant]"); or at least require the individual plaintiff to prove that he heard or had access to the defendant's statements, see In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 833 (S.D. Ohio 2012) ("Without alleging that he heard or had access to [the defendant's] affirmative statements, or identifying the specific statements on which he allegedly relied, Colorado Plaintiff cannot demonstrate proximate cause under the CCPA [Colorado Consumer Protection Act].").

Even in states that allow a classwide presumption of reliance in certain circumstances, "[a]n inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class." Davis-Miller v. Auto. Club of S. Cal., 134 Cal.

Rptr. 3d 551, 565 (Cal. Ct. App. 2011) (citation omitted).  Classwide reliance can

be presumed in some states when there is a long-term marketing campaign to

which the class members were all exposed – such as the tobacco and cigarette

companies' decades long pervasive campaign or when the misrepresentation at

issue was clearly presented to every class member, such as when it was on the

label of a consumer product that every class member purchased.  See, e.g.,

Patterson v. BP Am. Prod. Co., 240 P.3d 456, 465–67 (Colo. Ct. App. 2010)

("[P]resuming or inferring reliance is proper when plaintiffs are able to establish

material misrepresentations to the class on a common basis.") (citations omitted),

aff'd 263 P.3d 103 (Colo. 2011); Group Health Plan, Inc. v. Philip Morris, Inc., 621

N.W.2d 2, 14 (Minn. 2001) ("[W]here the plaintiffs' damages are alleged to be

caused by a lengthy course of prohibited conduct that affected a large number of

consumers, the showing of reliance that must be made to prove a causal nexus

need not include direct evidence of reliance by individual consumers of

defendants' products.").  This case is different.  Plaintiffs rely on a variety of

statements from advertisements and marketing that did not appear on

Hardieplank's label, and many named Plaintiffs testified that they never heard or

saw any Hardie advertisement before they purchased the product.  Also, because

some named Plaintiffs purchased a house with Hardieplank already on it, some

did not even known that they were purchasing Hardieplank because they did

not know what kind of siding was on the house, so there is no possibility that a

Hardie advertisement influenced their decision to buy the house.  In this case,

the consumer protection claims will require individualized questions of reliance.

### b)    Reliance for Breach of Warranty Claims

Exposure to the Hardie representation will also be required for the breach

of the informal express warranty claim under some states' laws.  Reliance is

required under Wisconsin.  See Malzewski v. Rapkin, 723 N.W.2d 156, 161 (Wisc.

Ct. App. 2006) (Wisconsin).  Additionally, California requires either privity or

reliance.  Coleman v. Boston Sci. Corp., No. 1:10-CV-01968-OWW, 2011 WL

3813173, at *4 (E.D. Cal. Aug. 29, 2011).  And reliance is relevant to prove

whether a representation has become a basis of the bargain under Ohio law.

Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prod. Inc., No. 2:02-CV-1288, 2007

WL 894833, at *16 (S.D. Ohio Mar. 22, 2007).  See also Duncan Place Owners

Ass'n v. Danze, Inc., No. 15 C 01662, 2016 WL 3551665, at *11 (N.D. Ill. June 30,

2016) ("Some Illinois courts have suggested that a showing of reliance is

required.  Other Illinois courts have held that a plaintiff need not plead reliance,

and that a seller's representations actually create a rebuttable presumption of reliance by the buyer.") (citations omitted).

The question of whether each class member relied on – or, at a minimum, was exposed to – a specific representation made by Hardie before purchasing the siding will require individualized analysis. Even among the named Plaintiffs, many were not exposed to any representation made by Hardie before making their purchase. As to those class members who were exposed to a representation from Hardie, the Court would need to inquire as to whether the individual actually relied on that representation in purchasing the siding. And the Court would also need to interpret the meaning of the representation upon which the individual relied.

### 5.   Injury

Determining whether any putative class member was injured will require a highly individualized inquiry. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Wal-Mart Stores, Inc., 564 U.S. at 349–50 (citation omitted). Moreover, "[i]t is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the

product they own." <u>Briehl v. Gen. Motors Corp.</u>, 172 F.3d 623, 628 (8th Cir. 1999) (citation omitted). "It is not enough to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect." <u>O'Neil v. Simplicity, Inc.</u>, 574 F.3d 501, 503 (8th Cir. 2009).

Plaintiffs allege different types of injuries to the siding that have different potential causes – fading or peeling could be caused by the type of paint or coating applied, while gapping or warping would have no connection to the coating, and delamination is an entirely different type of injury. The "common injury" asserted by Plaintiffs – low ILB strength – has not even been shown to be an injury. The only tie between ILB and delamination and coating issues is Wolf's opinion, which is unreliable and unhelpful and has been excluded. Even Plaintiffs' own experts do not opine that low ILB strength is related to gapping or warping. The other evidence before the Court further militates against a one-size-fits-all resolution that all Hardieplank suffers low ILB and a propensity to delaminate. For instance, Hardie has a low warranty claim rate ([Docket No. 273] Allport Decl., Ex. 8, Sealed Priest Report at 22) and Plaintiff Masoud Kavianpour manages or owns at least 16 buildings with Hardieplank siding but

has only experienced problems with the siding on one of them ([Docket No. 273]

Allport Decl., Ex. 10, Kavianpour Dep. 27-29).

### 6.    Causation

Causation is a key reason certification is inappropriate.  Even if Plaintiffs

could prove that Hardieplank has a common characteristic of low ILB strength,

and that this low ILB increases the propensity for the issues alleged here, such as

delamination and warping (neither of which is supported by the evidence),

individual causation issues would still predominate.  Based solely on Plaintiffs'

experts' own photographs of the damage and their testimony, it is evident that

installation error is a major cause of the deterioration alleged by Plaintiffs.  It is

apparent to the naked eye that insufficient clearance and placement of siding

such that it would be in standing water were common in the installation of

Plaintiffs' Hardieplank that suffered delamination.  (Cf. [Docket No. 273] Allport

Decl., Ex. 32, 2004 Hardie Installation Instructions (requiring a certain amount of

clearance between the siding and the grade, steps, paths, decks, driveways, and

roofing and also instructing that Hardieplank should not be installed "such that

it may remain in contact with standing water").)  There is evidence that warping

was actually the Hardieplank's reaction to warping in the underlying materials

and studs.  Before liability could be decided, individualized inquiries would be required into each class member's siding to determine whether a defect caused the claimed deterioration, as opposed to installation error.

This case is not like In re Zurn Pex Plumbing Products Liability Litigation. 267 F.R.D. 549, 563 (D. Minn. 2010), aff'd, 644 F.3d 604 (8th Cir. 2011).  Here, the evidence is strong that installation error played a role in Plaintiffs' injuries.  Also, the Zurn Pex plaintiffs' expert opined that, inevitably, all of the product would fail upon contact with water, 644 F.3d at 617, whereas, here, Plaintiffs' expert merely opines that low ILB increases a propensity for delamination and adhesion problems (Exponent Report at 2).  Here, there is no evidence demonstrating the likelihood that properly installed Hardieplank would be exposed to enough moisture and freeze-thaw cycles in the field to actually cause delamination. Hardie's low warranty claim and Kavianpour's experience with 16 buildings with Hardieplank shows the existence of evidence that all Hardieplank will not inevitably fail.  See, e.g., U.S. Hotel & Resort Mgmt., Inc. v. Onity, Inc., No. CIV. 13-1499 (SRN/FLN), 2014 WL 3748639, at *7 (D. Minn. July 30, 2014) ("Here, in contrast [to Zurn Pex], the locks do not begin to fail on their own upon installation, nor are they all 'doomed to fail' eventually.").

54

Overall, there are multiple possible causes for Plaintiffs' alleged siding

problems, and these individualized issues of causation will predominate over

any alleged common issue of product defect.  See Haley v. Kolbe & Kolbe

Millwork Co., No. 14-CV-99-BBC, 2015 WL 9255571, at *13 (W.D. Wis. Dec. 18,

2015) ("[D]etermining what caused the rot in each window in each class

member's home requires an individualized inquiry with respect to the climate in

their home state, window maintenance and upkeep, installation and the specific

window problems experienced by each class member.  . . .  Although the

question [of] whether the alleged defects are a potential cause of rot in certain

parts of a window can be answered for the whole class, the actual cause of rot in

each of the class member's windows requires individual analysis and proof.")

(citation omitted), aff'd 863 F.3d 600 (7th Cir. 2017); Pagliaroni v. Mastic Home

Exteriors, Inc., No. CV 12-10164-DJC, 2015 WL 5568624, at *12, *13 (D. Mass. Sept.

22, 2015) (denying class certification when "the named Plaintiffs allege that they

suffered failure of their Oasis decks, whereas most class members have not

reported any problems with their Oasis decks," and holding that "questions of

injury and causation are not amenable to common resolution for this proposed

class, where the record raises individualized questions of proof as to whether an

Oasis owner has actually suffered any injury, whether that injury has already

been remedied by the Oasis warranty program and whether a particular

representation or action by Defendants caused that owner's damages").

### 7.    Damages

While, alone, the fact that damages must be determined individually

would not cause the Court to refuse to certify a class, this is yet another factor

supporting denial.  Here, Plaintiffs provide no general method for determining

damages.  Although the Exponent Report purported to set forth a damages

formula, Wolf admitted in his deposition that the formula was inadequate and

that individual claims procedures and home inspections would be necessary to

determine damages.  ([Docket No. 273] Allport Decl., Ex. 7, Wolf Dep. 21-24,

171.)  To determine damages, the decisionmaker would need to make thousands

of individual determinations regarding the type of damage suffered, the number

of boards needing replacement or repair, the labor cost in the local market, and

whether consequential damages exist.

### 8.    Hardie's Defenses

"Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge,

enlarge or modify any substantive right,' a class cannot be certified on the

premise that [a defendant] will not be entitled to litigate its [] defenses to

individual claims." <u>Wal-Mart Stores, Inc.,</u> 564 U.S. at 367 (citations omitted).

Here, Hardie's statute of limitations defense will raise a plethora of

individualized legal and factual questions.  The different states' laws at issue

have different lengths of statutes of limitations and different accrual rules.  And

the statute of limitations defense is a strong defense in many cases, particularly

because some states, such as Minnesota with a two-year statute of limitations,

have very short statutes of limitations.  Hardie has raised viable statute of

limitations defenses to many of the named Plaintiffs' claims.  To analyze

application of the statute of limitation, for many claims, the Court or jury will

need to determine when the siding was purchased, when the individual became

aware of the damage, whether the damage should have been discovered earlier,

and whether equitable tolling applies.

Additionally, with regard to the breach of the formal express warranty

claims, individualized questions must be answered to determine if the Limited

Warranty provides coverage to the individual plaintiff.  First, the Court must

determine whether a particular class member is a valid holder of the Limited

Warranty, as the Limited Warranty only extends to the first purchaser or owner

of the structure to which the Hardieplank is applied and the first transferee, while the proposed class includes any current owner of a structure with Hardieplank.

Second, the Limited Warranty excludes coverage if the Hardieplank was not installed in compliance with applicable building codes and Hardie's installation requirements and that failure caused the damage. As previously discussed, inspections of the named Plaintiffs' structures show that many had Hardieplank that was installed without complying with Hardie's installation instructions. Other Plaintiffs' Hardieplank was installed without a weather-resistive barrier below the Hardieplank, which is a building code violation. (See [Docket No. 273] Allport Decl., Ex. 16, Tsongas Report at 15.)

Third, the Limited Warranty also includes express exclusions, including one for the performance of third-party coatings applied to Hardieplank. Individualized inquiries will be required to determine whether a third-party coating was applied and whether a class member's paint adhesion failure, discoloration, or fading is covered or excluded by the Limited Warranty.

Fourth, to determine Hardie's liability to any class member, it will have to be determined if she previously submitted a warranty claim and whether

Hardie's response constituted breach of its warranty obligations. Many named Plaintiffs did submit a warranty claim to Hardie, and Hardie provides evidence that it offered them the full amount due under the terms of the Limited Warranty. Thus, Hardie asserts that it did not breach its warranty obligations. Each warranty claim file for each class member would need to be analyzed to determine whether Hardie breached its warranty obligations.

## I.   Whether a Class Action Is a Superior Method of Adjudication (Rule 23(b)(3))

The Court concludes that a class action is not a superior method of adjudication in this case. First, this is not a negative value suit. Plaintiffs' claims are not de minimis: replacing a substantial amount of siding would cost thousands of dollars. (Plaintiff Swiencki received an estimate of $9,000 to replace his siding. ([Docket No. 383] Second Polakoff Decl., Ex. 6.) Plaintiffs the Angelicis received estimates from $19,000 to $34,000. ([Docket No. 365] Polakoff Decl., Exs. 6-7.))

Second, the proposed class definition requires the Court to apply the laws of at least eight states, and these laws vary in significant ways, from whether reliance is required to the statute of limitations to whether presuit notice is

required to whether the product must be sold directly to the consumer. Jury instructions would be unwieldy and complex.

For example, the Virginia Consumer Protection Act ("VCPA") holds that the sale of a product to a contractor for installation on a home is a commercial transaction, not a consumer transaction within the VCPA. In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig., No. 1:13-MD-2495-TWT, 2015 WL 3824020, at *3 (N.D. Ga. June 19, 2015). Other states' consumer protection statutes have no such limitation. See also Perras v. H & R Block, 789 F.3d 914, 918 (8th Cir. 2015) (holding that, when "[t]he law applicable to each class member would be the consumer-protection statute of that member's state [], questions of law common to the class members do not predominate over any individual questions of law"). The laws governing breach of express warranty also vary among the relevant states, as previously discussed, including whether reliance or presuit notice is required. See, e.g., In re Hardieplank Fiber Cement Siding Litig., No. 12-MD-2359, 2013 WL 3717743, at *11 (D. Minn. July 15, 2013) (dismissing, without prejudice, certain Plaintiffs' Illinois breach of warranty claims for failure to provide presuit notice to Hardie).

Thus, because the proposed class would not meet the commonality, predominance, or superiority requirements of Rule 23, the Court denies the motion to certify the Rule 23(b)(3) class.

### J.    Certification of an Injunction Class

While "Rule 23(b)(2) does not refer to the predominance of common questions, class claims thereunder still must be cohesive." Avritt, 615 F.3d at 1035. "[C]ohesiveness is even more important for a Rule 23(b)(2) class because, unlike Rule 23(b)(3), there is no provision for unnamed class members to opt out of the litigation." Id. "A class will not be cohesive if factual differences amongst the class members translate into significant legal differences." In re Baycol Prods. Litig., 218 F.R.D. 197, 211 (D. Minn. 2003) (citation omitted).

The Court denies Plaintiffs' request for a nationwide injunction class. The class is not cohesive for all of the reasons previously discussed. Additionally, as the proposed class is nationwide and contains no date limits, the Court would have to apply the laws and statutes of limitations of fifty different states. Plaintiffs make no attempt to show that the fifty states' laws are similar.

### K.    Issue Class under Rule 23(c)(4)

Federal Rule of Civil Procedure 23(c)(4) provides: "When appropriate, an action may be brought or maintained as a class action with respect to particular

issues." "[T]here is a conflict in authority on whether such a class may properly

be certified under Rule 23." In re St. Jude Med., Inc., 522 F.3d 836, 841 (8th Cir.

2008). "Even courts that have approved 'issue certification' have declined to

certify such classes where the predominance of individual issues is such that

limited class certification would do little to increase the efficiency of the

litigation." Id. Issue certification should be denied when "certification under

(c)(4) will not make the case more manageable, . . . and individual trials will still

be required to determine issues of causation, damages, and applicable defenses."

In re Baycol Prod. Litig., 218 F.R.D. at 209.

The Court denies Plaintiffs' alternative request to certify an issue class.

Even if the Court certified a class solely on the question of whether Hardieplank

is flawed in that it has a low ILB that increases its propensity to delaminate and

deteriorate in other ways, any efficiencies gained will "ultimately unravel[]"

because individual trials will be required on causation and damages. Ebert v.

General Mills, Inc., 823 F.3d 472, 479 (8th Cir. 2016).

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.    Plaintiffs' Motion for Class Certification [Docket No. 229] is **DENIED**.

2.    Defendant's Motion to Exclude Plaintiffs' Experts' Testimony [Docket No. 244] is **GRANTED**.

Dated:   January 2, 2018                          s/ Michael J. Davis
                                                  Michael J. Davis
                                                  United States District Court